[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff and the defendant were married on May 19, 1984, in Litchfield, Connecticut. The plaintiff's birth name was Bochicchio. One child was born to the parties, Gina Mary, on May 1, 1985. The parties have been Connecticut residents for the statutory period conferring jurisdiction of the issues CT Page 9171 in this court.
This is the second marriage and divorce for both parties. The plaintiff has no children from her first marriage, but the defendant has two children from his prior marriage. It is clear that the marriage has irretrievably broken down, sufficient for the court to enter a dissolution thereof.
The parties stipulated to the value of the marital home. That value is agreed to be $213,000.00. The parties pre-marked exhibits prior to eliciting any testimony.
The court finds the following facts: The plaintiff is a registered nurse, currently employed at the Newtown Correctional Facility. The defendant is employed by the State of Connecticut, Department of Public Safety. Both parties reside currently in the Town of Woodbury, where their child is being educated in the public schools
The plaintiff worked for the Connecticut State Police as a dispatcher for approximately 9 years, until 1983. Her ex-husband was also a trooper, and her current husband felt their lives would have a better quality if she no longer worked among them. She testified that her husband assured her at the time that he would take care of everything if she left her employment. He thereafter suggested that she go to school for nursing, especially after their marital problems began. She testified that she had had no desire to be a nurse, but rather to follow her family members as a police officer. She had an opportunity to be considered as a Waterbury Police Officer, but her husband verbalized strong opposition to her becoming involved in police work.
She testified that she only did "fair" at nursing school because it was not something that she took to naturally. She has progressed to being employed fulltime in December of 1994, when she commenced her employment with the State of Connecticut. She has an Associates Degree from Naugatuck Valley Community Technical College. It is her highest level of education. Her current hours are from 8 a.m. to 4 p.m. with weekend requirements every other weekend. She claimed that the job fit her schedule for caring for their child.
Had she remained with the State Police, she would have twenty years of seniority, and be eligible for retirement CT Page 9172 pursuant to the appropriate contract. The funds that she took out of the State of Connecticut pension were utilized to purchase the Bassett Road property at the beginning of the marriage. She claimed to have been in good financial health at the time of the marriage, with no debt, some savings, and good employment.
The current marital home was purchased by the plaintiff and her first husband, and she retained ownership thereof. She bought out her former husband's interest in that property for approximately $5,000.00. They sold property in Watertown, realized approximately $23,000.00, and put that sum into the home they subsequently built.
The defendant worked overtime consistently during the course of the marriage, both on construction sites in uniform, and later on homicide investigations as a member of the Major Crime Squad. Her claim is that he cut down on his overtime when the divorce action was commenced. He denies that allegation.
She claims few advancement possibilities without a Bachelor's Degree. She is living in the marital home, which the defendant vacated approximately one and one-half years ago. He is residing in his parents condominium at Woodlake in Woodbury with his girlfriend, Lana. The child lives with her mother, and visits with her father infrequently according to mom. He did not show up because of his work. Mom claims it became a nightmare. The child had appointments canceled, and ice skating lessons missed. Since the court date was established, she claims dad has been visiting consistently on alternating weekends. She claims the child is an excellent student, and is happy that dad is exercising visitation more often.
She testified that they have some conflicts about the extent of activities engaged in by the child. Mom volunteers with the Ambulance in Woodbury, at their daughter's school, and teaches religious education at St. Theresa's. She desires to remain with the child in the marital home, and to continue in the same school system. The mortgage on the marital home is currently around Seven Hundred ($700.00) Dollars per month.
The plaintiff testified that there were good times before the marriage, especially as they lived together prior to the CT Page 9173 marriage. She said she loved her husband, but that he was unwilling to engage in family activities with her and the child. There was an earlier separation and reconciliation. Prior to their marriage, they had no social relationship. He did not take her to State Police social events, and only went an vacation twice, once with another trooper and his wife, and once to Florida to see his parents.
She claimed to have had a social life prior to her involvement with the defendant, but that thereafter he would not include her in testimonial dinners or inform her of funerals and the like. She was not allowed to continue her social relationships with other troopers or their families. They did not entertain other people in their home, and she claimed that he made family and friends uncomfortable within their home. She claimed that he did not attend any family functions, even his own family functions, and she was required to make excuses as to his absence.
She testified that she asked him why it was that he refused to be seen with her in public, or in a social situation. She testified that he did not go to child birth classes, or participate in raising the child. He did not object to her going out with the child, but would not join them in any activities. She claimed that he did not change the baby, unless it was an emergency. During the course of the marriage, she claimed they went out to dinner approximately five times.
The parties hired Griffin Custom Builders for the construction of their house. It was a "disaster" according to the plaintiff. She was pregnant and was expected to call subs, and pick out tile, set up the kitchen, etc., while he worked overtime.
She claimed that defendant told her that he was paying common fees on the Woodbury condo to his parents. He has always had an excellent relationship with his parents and his sister, who have been generous to him, historically. When confronted, defendant admitted that he was seeing another woman, though not the woman she suspected. She is currently involved with a man by the name of Tom Moskaluk, which relationship started, she claims, after the parties talked about going their seperate [separate] ways, and after the breakdown of the marriage. CT Page 9174
She claimed that the parties had not been intimate with each other for a one year prior, and that their intimacy was sporatic [sporadic] prior to that time. She blames the breakdown of the marriage on defendant's total lack of attentiveness to her and their child. While she was allowed to do what she cared to do, and provided for financially, she was not emotionally or physically fulfilled.
The defendant paid child support for his children of his first marriage, during the course of this marriage. She claimed that she had a good relationship with those children, especially with Lisa. When their child was born, there was some jealousy, but that subsided over time.
The defendant had no assets at the time he left his first marriage, and the family joke was that he came into the marriage with a cooler. She claimed that she was supportive of his relationship with his children, and his responsibility to support them.
She claimed that he could, as a sergeant, schedule his overtime, and that he often selected what overtime he would be involved in. They discussed construction overtime, but he claimed that he would have to be on call for his work in the Narcotics Task Force, would have to secure a cruiser, and that it was not workable.
Her current job has grave risks, in a prison population with a high incidence of HIV and TB, and assaultive behavior. She claimed to have been supportive of her husband's decision to remain a Sergeant, rather than taking promotional examinations. She testified that she tried to reconstruct the marriage by encouraging him to participte [participate] in outings. She claimed that he only liked the company of other troopers, or his own family. She testified that after reflection, she did not contribute to the breakdown of the marriage. She claimed that prior to the breakdown of the marriage, she tried to have him understand her needs, insisted that they seperate [separate] the first time, but even then his acknowledgement of their marital difficulties only lasted a short time. He simply was unable to hear and respond to her needs.
She testified that in 1993, when they filed a joint income tax return, they received a substantial refund. For CT Page 9175 1994, they are attempting to file jointly.
She currently drives a 1987 Porsche 924, and he has a State car. Her car is in need of repair.
On cross-examination, she testified that she was taking home $165.00 per week for her work as a dispatcher at the State Police. Her financial affidavit from his first divorce in November of 1982 disclosed no savings. She owned scant personal property which was disclosed on that affidavit.
She admitted that her former husband harrassed [harassed] her at her job, and she was investigated along with all civilian staff with respect to the taking of sick time. She claimed that her termination with the State Police was insisted upon by the defendant, and that it was not acceptable that she seek a transfer. He denies that that occurred.
In May of 1983, she testified that she was living with the defendant, which she could not recall was prior to or after her divorce. She further conceded that they may have been married on May 18, 1984, but she could not remember, because they never celebrated their anniversary. Prior to living with the defendant, she claimed she lived on other monies, but none were relected [reflected] on her financial affidavit. She conceeded [conceded] that she had never been very good at record-keeping, and could not recall what money she might have had at any given time.
She could not remember if she was represented by an attorney at the time of the divorce, until her memory was refreshed by looking at her financial affidavit.
The plaintiff purchased the lot in Woodbury for $32,500.00 by way of cash and purchase money mortgage to the sellers. That property was bought during the plaintiff's first marriage with Mr. Scott Lyke. She left the employ of the Connecticut State Police in 1983, whereupon she received a severence [severance] package. The plaintiff was questioned concerning her purchase of the lot in Watertown for $17,000.00. She persisted in her claim that the defendant had no money to contribute to such a purchase when they first started to live together, and that he could not have made a contribution to that property. CT Page 9176
While she received some monies at the time she seperated from her employment, she was unable to demonstrate by recollection how she accumulated the funds necessary to finance that purchase. She did have a joint checking and savings account with the defendant, prior to and during the marriage. They together paid her former husband to own the Woodbury lot in full. On the issue of a family life, the plaintiff persisted during cross-examination that their problems stemmed from shortly after the birth of their child, and through a subsequent miscarriage. Upon questioning concerning her entertainment and weekend trips, skiing and to the auto races, she denied inappropriate relationships with male friends. She drove a truck in the wintertime that belonged to one Marty Marola, who also appears to be a creditor on her financial affidavit. She used vehicles belonging to other male friends during the marriage also.
Concerning the construction of their home, the plaintiff agreed that there had been extras ordered for the home, and that painting had been done as an extra. When questioned concerning the driveway, plaintiff was unable to recall if that was included in the plans. She conceded that the septic system had to be redone.
An appraisal of the Woodbury property with construction complete indicated a value of land as $37,000.00.
At their marriage, the parties received cash gifts which were put into the construction of the home. She could not recall making a deposit into a joint bank account shortly after their marriage.
There is an outstanding question as to whether or not the plaintiff can buy back her previous time of state employment for retirement purposes, insofar as she is still on probation with this new job. She agreed that she did discuss the need of a career with her husband, especially because of the breakdown of their marriage, but that he did not want her to become a police officer, and derided her interest in becoming a stone mason. He did assist her in pursuing her education. She had not had a job outside the home since leaving the State Police in 1983.
Plaintiff was questioned concerning the visitation issues which have been outstanding, and somewhat problematical, CT Page 9177 because of the vagueries [vagaries] of his work schedule. Her indication is that despite certain disappointments of the minor child when visits were canceled, that she agreed that defendant should visits as often as he could, and that it was important for the child.
The plaintiff rested after the testimony of the plaintiff, reserving her right to call a pension expert at a later time, should the defendant persist in his objection to the proffer of the expert's report in lieu of his testimony.
The defendant was called as his own witness, and testified that the parties cohabited for approximately two years prior to their marriage, and prior to her divorce from Mr. Lyke. The parties were married, according to this witness, on May 18, 1984. The defendant, who was stationed at the Westport Barracks at the time of her termination from employment from the Connecticut State Police, denied that he had insisted that she leave the employ of the Connecticut State Police.
The defendant testified that the problems in their marriage began when she suffered a miscarriage. She was very emotional, and took the miscarriage very hard. He feared that she would be devastated by another miscarriage, and when she wanted another child, and he declined at that time, he left the marital home for his uncles home in Statford. He was there for two months, but returned to try with her to make their marriage work.
She was in counseling, and asked that he not join in that counseling. During the separation, plaintiff admitted that she had received flowers from Richard Bromley from Watertown, and that she was seeing him. They reconciled, and she admitted that she had gone for a motorcycle ride with Mr. Bromley.
In response to interrogatories filed by the plaintiff, the defendant said that he believed the marriage broke down, due to the fact that the parties were pursuing divergent careers, and that they "grew apart."
The defendant claimed he had an excellent relationship with their daughter, and he tried to see her as much as possible. In January of this year, he began seeing her on alternating weekends. Since he left the family home in CT Page 9178 January of 1994, prior to the weekend visits, defendant saw the child on Tuesday, Thursday, and Sunday. He was forced to cancel because of work, and he knew he disappointed his daughter upon occasion when he had to change his plans.
During the marriage, the plaintiff "took off" on weekends. Those trips were for NASCAR races in the summer, and skiing in the winter. The defendant testified that this occurred around 1990, and when the plaintiff left, the minor child remained at home with the defendant on many of those weekends, according to him.
The defendant testified that the family money that was received from January of 1983 until the separation was from his employment outside the home, and from gifts. Defendant's Exhibits 8 and 9 were demonstrated to show the monies into the family in 1984 and 1985. The defendant claimed that he had money with which he contributed to the purchase of the Watertown property. He testified that he had approximately $10,000.00, half of which was borrowed from his parents. Approximately $7,000.00 was contributed by the plaintiff. The parties yielded a net gain of $23,000.00 from the sale of that property.
Defendant's exhibit 9 was opened with the proceeds of that sale. Defendant's exhibit 8 was opened after their marriage. The defendant testified that $7,000. was received as wedding gifts, and the remaining was a payment of $12,500. first payment from his first wife as a property settlement (see Defendant's Exh. __). The defendant recalled opening another bank book for the deposit of wedding gift money (Defendant's Exh. 13). That shows a deposit of $7,497.00 on May 22, 1984.
The defendant claimed that the expenses for the construction of their home came from these accounts and from their joint checking account. The parties decided not to build on the Watertown property during the summer of 1984, but to build on the Woodbury lot. It was agreed that that purchase of plaintiff's ex-husband's interest came from the savings account. In August of 1984, the defendant received $7,025. settlement from a pension dispute with the State of Connecticut. All Connecticut State Troopers received a lump sum payment. CT Page 9179
The parties commenced construction in October 1984 of the Woodbury home. The defendant's father had been in the construction business, and understood the additions to the original contract price of $82,000. Another survey had to be done to secure financing. He claimed that he hired Bud Neil to cut in the driveway and put in the septic system for approximately $10,000. The allowance price for the house required the expenditure of extras that were decided upon by the parties.
The defendant claimed that much of the work on the property was done personally by him. He claimed that in reviewing bills for construction and recalling expenditures, that the parties spent approximately $100,000. on their home. The total borrowing to build was a construction mortgage of $55,000. Plaintiff's Exhibit 2 is the construction contract with payment schedule. The payments can be tracked from the passbooks, Defendant's 8 and 9.
The parties moved into the home in April of 1985, but the parties had not completed the home. The last payment due under the contract was not made as scheduled because of finish work. The entries in the passbook demonstrate that the defendant received $25,000. as a divorce settlement.
In July of 1984, the defendant also took over the payment of the original mortgage of $18,000. on the Woodbury property. In May of 1989, the defendant took a loan from the credit union to pay the original mortgage and to put in a swimming pool. That loan was paid off in May of 1994. The defendant claims that the plaintiff did not make any contribution towards the payoff of that loan.
The parties added a fieldstone fireplace, oak flooring in the family room, and in 1993 a tile floor. A split rail fence was put in, along with a shed on the property. Those repairs were made from income.
The defendant testified that he and his wife did discuss career options for her when they agreed that their marriage would not likely work. He claims that he did not force her into that profession. The dissolution was filed in 1992, and he wanted her to complete her education and retained her on his medical policy. He claimed that he wanted to see her to completion of her schooling before he left the marital home. CT Page 9180
He makes a base salary as a sergeant of $48,000.00. In 1994, he made $62,000. In 1993, their combined income was $67,000.00, of which the plaintiff made $3,500. All tax returns have been made exhibits in this case. His additional income is from overtime. In his current assignment, he is allowed eight (8) hours of overtime. The economy of the state required less overtime to be paid, according to defendant.
He claimed that due to the current undercover work he does, that it would be unadvisable for him to don his uniform to direct traffic on construction sites.
He lives in his parents' condominium. They live in Naples, Florida. He pays $600.00 per month, by paying $559.00, which are fees and taxes, paid directly to the condo association. He is also doing rehab on the condo to prepare it for sale. As of today, he does not pay actual money to his parents.
The joint VISA was $7,500. when he left the marital home. He canceled that account and has been paying it. Of that amount, $2,500.00 was her retainer. The balance is approximately $4,100. The defendant also owes his parents $3,000. for electric bills, the house mortgage and taxes, and child support.
The defendant agreed that he had his parents old bedroom set, and the cooler. He testified that she had some old furniture, and the parties both laughed when he testified that they did not have much when they set up housekeeping together. He feels that he has a close relationship with her family, and spent a lot of time with her brothers. He claimed that if he refused to go to family functions, it was with good reason, and rarely. He claimed that he enjoyed all of their family gatherings.
He agreed that he lived with a woman for a couple of months, but that she no longer resides in the condo with him.
On cross-examination, he conceded that he paid approximately $600. per month as child support. His son turned 18 in 1988 and his daughter turned 18 in 1989. He said he paid what the judgment said he was ordered to pay. CT Page 9181
He has done some work on the condo, and has only lived with his sister and his daughter. He testified that he did not know what the fair market rental of that property was. The defendant was also cross-examined on the financial affidavit he filed for his divorce in March of 1983. (Plaintiff's Exhibit 11) The affidavit disclosed no savings accounts. He had claimed that the plaintiff was living with him and being supported by him at the time of his divorce, and within two months had $10,000. with which to invest in real estate. The defendant claims that she had no savings accounts at the time of their marriage.
The plaintiff was recalled on rebuttal on the issue of a relationship with Richard Bromley. She denied having a romantic relationship with him. She further denied that their child remained home with him while she left on weekends. She testified that most often the child accompanied her. She also claimed that there were few people at their wedding, and that there was no way that they would have received over $7,000. from wedding gifts.
The plaintiff called John K. Mansur, a pension evaluator, as an expert witness, pursuant to her request to reopen her case should there be a perceived need to call the witness. His valuation of the pension appears as Plaintiff's Exhibits 9 and 12. He will receive a monthly benefit of over Three Thousand ($3,000.00) Dollars, as well as medical coverage. Most of the value of the pension was accrued in the last ten (10) years, during the course of the marriage. His pension, clearly will exceed her State of Connecticut retirement package at her date of retirement, which will be some time from now. He is currently eligible to retire. He has both the age and time on to retire if he chose to do so.
The court has earlier found that the marriage was irretrievably broken down. In its review of the record in this case, the court is left with a question as to just why the marriage was so unfulfilling for these parties. They clearly have supportive families, and clearly are in contact with them. The parties share a child. Neither party testified as to arguments or serious disagreements. There's was a nagging emptiness which somehow could not be filled, especially for the plaintiff. She impressed the court as rather lonely, despite her job of raising their child, and going back to school to work on her education. CT Page 9182
The defendant worked hard to provide for his family, and to meet his court-ordered obligations to his first family. The plaintiff joined with him in acknowledging that obligation. It is difficult for the court to find fault in this matter. The court finds compelling the plaintiff's claim that the defendant did not address her needs after the birth of their child, and following the loss of their second child through miscarriage. However, the defendant continued to work to meet all the obligations of support that he had, and the parties accumulated assets as a result. The defendant does not seem to credit the plaintiff's participation in their family life when testifying concerning assets. The court believes that he fears the loss, for a second time, of substantial effort in the form of a property distribution which will not allow him to retire. It is always difficult for the court to fashion orders in cases where the issues are not drawn with sharp lines. The claims for relief in this case demonstrate how much differently the parties have framed the issues, and how the court has assessed the evidence presented. They are both lacking in much of the proof that they propose.
The court has reviewed the evidence, both testimony and exhibits, and makes the following orders:
1. CUSTODY: The court has reviewed the claim for relief, and compared the similar claims for joint custody in conjunction with the evidence concerning the minor child. The parties focused their dispute over finances, and agreed that they each had a well-developed relationship with their daughter. Their agreement for joint custody, with Gina living primarily with her mother, and having reasonable, flexible and liberal time with her father appears to be in the child's best interest. The defendant father has a history of meeting his financial committments to his grown children from his first marriage, and the plaintiff is supportive of a full and loving relationship between father and daughter.
2. CHILD SUPPORT. The defendant shall pay child support according to the percentage requirement of the Uniform Support Guidelines, based on his actual earnings. He shall pay One Hundred, Eighty ($180.00) Dollars per week, and shall disclose quarterly his actual earnings. Any amount due over the base amount shall be computed and paid within fourteen (14) days. CT Page 9183 Child support shall be paid by contingent wage execution, and paid directly to the plaintiff. His obligation to pay child support shall extend to the child's graduation from high school or her eighteenth birthday, whichever last occurs.
The defendant shall continue to cover the child on his health-related insurance through his employment, and shall continue that coverage while she is eligible for such coverage. The parties shall share all unreimbursed health-related expenses for the minor child. The provisions of Conn. Gen. Stat. Sec. 46b-84(c) shall apply.
3. LIFE INSURANCE: The defendant shall continue in full force and effect all available life insurance provided through his employment, and name the minor child irrevocable beneficiary of those policies until her eighteenth birthday, or her graduation from high school, whichever last occurs.
4. INCOME TAX DEDUCTION: The parties shall alternate the income tax exemption for the minor child, with the defendant claiming her in the odd years, and the plaintiff in the even years.
5. ALIMONY: The court finds that the parties reached an accommodation whereby the plaintiff remained out of the workforce for an extended period of time to attend to her duties as homemaker and mother. The court cannot find that the decision was solely the defendants, as argued, nor that he "forced" the plaintiff to leave her job as a civilian dispatcher for the Connecticut State Police. It did, however, require her to be reeducated, and to now earn one-half of what the defendant earns. This is an eleven years marriage, with a separation of approximately two years. The defendant did provide the financial resources to fund her reeducation, but she will not achieve his level of income in the foreseeable future.
The court orders that the defendant pay the sum of One Hundred ($100.00) Dollars per week for a period of five (5) years. Thereafter, he shall pay the sum of One ($1.00) Dollar per year until the child reaches the age of eighteen or graduates from high school. That alimony shall be modifiable only if the plaintiff is unable to work, as certified by two doctors. The award of periodic alimony shall terminate upon the death of either party, the plaintiff's remarriage, or her CT Page 9184 cohabitation according to the statute.
The court, in limiting the time of payment of alimony, contemplates that the plaintiff will be well-established in her career, and that the orders of the court will not burden the defendant for an undue period, so that his option to retire may be exercised. While the defendant's efforts to facilitate the plaintiff's ability to become employed are recognized, the court finds that their incomes remain disparate.
6. REAL PROPERTY: The court finds that the parties contributed equally to the acquisition and maintenance of their home in Woodbury. The court finds that it is in the child's best interest to remain a resident of Woodbury to maintain continuity of her school system, and school friends, at a cost which is reasonable for the primary residential parent. Therefore the court orders that the defendant convey his interest in and to the marital home to the plaintiff. The court further orders that the transfer be further conditioned by the granting back of a mortgage in favor of the defendant in the amount of Seventy-five Thousand ($75,000.00) Dollars, with no interest. The plaintiff shall be responsible for, and hold the defendant harmless from the first mortgage payments, taxes, and insurance on the marital home.
The mortgage shall be payable upon the remarriage of the plaintiff, her cohabitation within the meaning of the statute, or if she ceases using the marital home as her primary residence with the minor child. The mortgage shall be payable no later than the date when the minor child completes her college education, or if she does not attend college, then when she has graduated from high school, and is not dependent on the parents for her continued support. It is the contemplation of the court that the mortgage will be payable within twelve (12) years.
7. PENSIONS: The plaintiff shall retain her pension. The defendant shall convey to the plaintiff by way of a Qualified Domestic Relations Order one-third (1/3) of his pension. The bulk of his pension was acquired during the last ten years, or during the time of the marriage, and the plaintiff has been placed in a subordinate position with respect to her ability to acquire a pension. Furthermore, because her income is one-half of his, her ability to fund a CT Page 9185 pension close to his in value is remote.
8. PERSONAL PROPERTY: The parties did not ask the court for an order of conveyance of personalty from their homes, so they shall retain personalty currently in their possession. The plaintiff shall retain the 1987 Porsche 924. The parties shall retain any bank accounts in their respective names.
9. DEBTS: The parties shall pay the debts listed on their respective financial affidavits.
Judgment shall enter consistent with this opinion.
DRANGINIS, J.